JON M. SANDS
Arizona Bar No. 010441
Federal Public Defender
District of Arizona
250 North 7th Avenue, Suite 600
Phoenix, Arizona 85007
(602) 382-2700   voice
Jon_Sands@fd.org
Attorney for Defendant

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| United States of America, | |
|---|---|
| Plaintiff, | No. 2:12-cr-01263-ROS |
| vs. | **Objections to Presentence Report** |
| Ahmed Alahmedalabdaloklah, | |
| Defendant. | |

Defendant Ahmed Alahmedalabdaloklah, through undersigned counsel, hereby submits the following objections to the draft presentence report (Doc. 1129).

### I.    Mr. Alahmedalabdaloklah objects that he was not convicted of any particular subsection of 18 U.S.C. § 2332a(a).

The cover page of the PSR suggests that Mr. Alahmedalabdaloklah was convicted of 18 U.S.C. §§ 2332a(a)(1) and (3). This is not correct. Subsections (a)(1) & (a)(3) of 2332a do not set forth separate crimes but rather separate means of committing the single crime of 18 U.S.C. § 2332a(a). Subsection (a)(1) relates to conduct occurring "against a national of the United States while such national is outside of the United States" and Subsection (a)(3) relates to conduct occurring "against any property that is owned, leased or used by the United States . . . whether the property is within or outside of the United States." 18 U.S.C. § 2332a(a). The second superseding indictment initially alleged that Mr. Alahmedalabdaloklah "employed the component parts [of IEDs] against U.S. military personnel," including two specific bombing instances in which U.S.

soldiers were killed in action. But the government ultimately abandoned, for want of evidence, all allegations that Mr. Alahmedalabdaloklah was responsible for or connected in any way to those specific incidents and did not attempt to prove them at trial.

At trial, the jury was instructed that Mr. Alahmedalabdaloklah was charged with violating only § 2332a(a), generally, (no subsection) and was told it should convict him if it determined that the object of the conspiracy was "to use the weapon of mass destruction against *either* (a) United States national while the United States nationals were physically outside the United States, *or* (b) any property that was owned, leased or used by the United States or by any department or agency of the United States, whether the property was within or outside of the United States." Doc. 921 (final jury instructions) at 29 (emphasis added). The government did not request a special verdict form as to which subsection the jury was convicting of, nor was the jury told that it had to unanimously agree as to which subsection. The verdict form simply said "Count 1: Conspiring to Use a Weapon of Mass Destruction." Doc. 923.

As written, the PSR incorrectly suggests that the jury unanimously found beyond a reasonable doubt that Mr. Alahmedalabdaloklah committed a crime both against United States nationals AND against United States property. This is not correct. For that reason, the PSR should be amended to state that Mr. Alahmedalabdaloklah was convicted only of "18 U.S.C. § 2332a(a)."

**II.  Mr. Alahmedalabdaloklah objects to application of the cross-reference to U.S.S.G. § 2A1.5 as barred by Amendment 826 to the Sentencing Guidelines, concerning Acquitted Conduct**.

Mr. Alahmedalabdaloklah objects to the cross-reference to U.S.S.G. § 2A1.5 applied in Paragraph 25 of the PSR because Mr. Alahmedalabdaloklah was acquitted of every count of the indictment that required the jury to find that his conduct was directed at people, rather than at property, and the recently passed Amendment 826 to the Sentencing Guidelines, effective November 1, 2024, bars

the use of acquitted conduct to calculate the sentencing guidelines. Mr. Alahmedalabdaloklah was moreover acquitted of conspiracy to commit murder. Calculating Mr. Alahmedalabdaloklah's guidelines based on conspiracy to commit murder when he was specifically and expressly acquitted of 18 U.S.C. § 2332(b)(2), "conspiracy to commit extraterritorial murder of a national of the United States" is disallowed under the current Guidelines.

Mr. Alahmedalabdaloklah was tried for the following offenses: Count 1: conspiracy to use a weapon of mass destruction, Count 2: conspiracy to maliciously damage or destroy U.S. government property, Count 5: conspiracy to commit extraterritorial murder, Count 6: Providing material support to terrorists.[1]

Of those four counts, Counts 5 and 6 required the jury to find that Mr. Alahmedalabdaloklah acted in support of or with the intent to commit murder. Specifically, Count 5 required the jury to find that that Mr. Alahmedalabdaloklah "joined . . . . [the] conspiracy, intending to further the crime of murder of a United States national." Count 6 required the jury to find that Mr. Alahmedalabdaloklah "provided . . . material support or resources . . . knowing or intending that the material support or resources were to be used in preparation for, or in carrying out, a conspiracy to commit extraterritorial murder of a national of the United States." Doc. 921 (final jury instructions) at 37, 39. Mr. Alahmedalabdaloklah was acquitted of both of those counts.

By contrast, Count 1 required the jury to find only that "the objects of the conspiracy were to use the weapon of mass destruction against *either* (a) United States national while the United States nationals were physically outside the United States, *or* (b) any property that was owned, leased or used by the United States or by any department or agency of the United States . . . ." Doc. 921 at 29 (emphasis

---

[1] Counts 3 & 4 involved enhanced penalties for possessing destructive devices in furtherance of Counts 1 & 2 and were vacated by the Court of Appeals in light of intervening precedent finding that the conspiracies charged in Counts 1 & 2 were not crimes of violence.

added). The government did not request a special verdict form requiring the jury to identify which theory it was endorsing in convicting Mr. Alahmedalabdaloklah under Count 1. Nor did Count 1 require unanimity as to either theory. Count 2 required a finding only of intent "to further the crime of malicious damage or destruction of United States government property by means of an explosive." Doc. 921 at 31.

Thus, Mr. Alahmedalabdaloklah was unanimously acquitted not just of every count of the indictment that required the jury to find an intent to commit murder, but of every count of the indictment that required the jury to find *any* intentional act against *any* person because Counts 1 and 2 both permitted conviction solely based on a finding of conspiracy to damage property.

Notwithstanding that Mr. Alahmedalabdaloklah was unanimously acquitted of every count of the indictment that required an intent to commit murder, the PSR recommends that his base offense level be based on § 2A1.5, the guideline for conspiracy or solicitation to commit murder based on a cross-reference from U.S.S.G. § 2K1.4(c). This is error.

Effective November 1, 2024, the United States Sentencing Guidelines prohibit the use of acquitted conduct in calculating the sentencing guidelines. Specifically, "Relevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant instance of conviction." U.S.S.G. § 1B1.3(c). In this case, murder does not "establish, in whole or in part," either the offense of Count 1, conspiracy to use a weapon of mass destruction or the offense of Count 2, conspiracy to maliciously damage or destroy U.S. government property because neither of those offenses required the United States to prove that Mr. Alahmedalabdaloklah acted with the intent to murder. The offenses that *did* require the government to prove that Mr. Alahmedalabdaloklah acted with intent to commit murder—Counts 5 and 6—resulted in acquittal. Under U.S.S.G.

§ 1B1.3(c), this Court therefore may not use the acquitted conduct of intent to commit murder in calculating Mr. Alahmedalabdaloklah's offense level, which renders the cross-reference to § 2A1.5 inappropriate.

### III. Mr. Alahmedalabdaloklah objects to the official victim enhancement.

Mr. Alahmedalabdaloklah objects to the official victim enhancement at PSR ¶ 27 for three reasons.

First, Mr. Alahmedalabdaloklah objects to the imposition of the 6-level increase under U.S.S.G. § 3A1.2(b) because it requires that a defendant's base offense level have been determined under Chapter 2, Part A (Offenses Against the Person). As noted above, Mr. Alahmedalabdaloklah objects to the application of the cross-reference to U.S.S.G. § 2A1.5 as based on acquitted conduct and therefore also objects to the 6-level enhancement under § 3A1.2(b) that results from this impermissible cross-reference. Section II, *supra*.

Second, Mr. Alahmedalabdaloklah also objects to a 3-level enhancement under U.S.S.G. § 3A1.2(a) as based on acquitted conduct. As noted above, Section II, *supra*, the jury acquitted Mr. Alahmedalabdaloklah of every count of the indictment that required it to find that he committed an act against a *person* rather than an act against *property*, and § 3A1.2 only applies to crimes against people. *See* U.S.S.G. § 3A1.2, comment, n. 1 ("This guideline applies when specified *individuals* are victims of the offense.") (emphasis added). Enhancing his sentence under § 3A1.2 requires consideration of acquitted conduct, which is barred under U.S.S.G § 1B1.3(c). Section II, *supra*.

Third, Mr. Alahmedalabdaloklah objects to enhancement under U.S.S.G. § 3A1.2 on the basis that no "specified individuals" have been or were ever identified by the government as victims of this offense. U.S.S.G. § 3A1.2, comment, n. 1. Indeed, as the PSR notes, "[t]here is no identifiable victim" to this offense. PSR ¶ 20. U.S.S.G. § 3A1.2 expressly "does not apply when the only

victim is an organization, agency, or the government." U.S.S.G. § 3A1.2, comment, n. 1. At trial, the government never tied Mr. Alahmedalabdaloklah to any specific instance of violence. It never produced a single piece of evidence connecting Mr. Alahmedalabdaloklah—or any member of the 1920s Revolutionary Brigades with whom Mr. Alahmedalabdaloklah is alleged to have conspired, for that matter—to any specific victim. In addition, as noted above, the jury acquitted Mr. Alahmedalabdaloklah of all counts that required a finding of acts against people. The government also never introduced evidence that Mr. Alahmedalabdaloklah was "motivated by" the status of any particular person. An enhancement under U.S.S.G. § 3A1.2 is therefore inappropriate.

In addition, even to the extent that this Court were allowed to consider acts against people, which it is not, in the absence of any specified victim, the government cannot prove that person so targeted was a government officer or employee given the large number of civilian military contractors that were present in Iraq. The Government Accountability Office found that "[a]t the peak of combat operations in Iraq and Afghanistan, the number of military contractors sometimes met or exceeded the number of U.S. military personnel in service."[2] Military contractors are not officers or employees of the United States. In the absence of any information whatsoever about specific incidents involving either Mr. Alahmedalabdaloklah or any members of the 1920s Revolutionary Brigades with whom Mr. Alahmedalabdaloklah is alleged to have conspired, application of an official victim enhancement is an exercise in pure speculation.

**IV.    Mr. Alahmedalabdaloklah objects to the terrorism enhancement**.

Mr. Alahmedalabdaloklah objects to the 12-level enhancement for an "offense . . . intended to promote a federal crime of terrorism," PSR ¶ 28, (1) on the basis that the record does not establish that Mr. Alahmedalabdaloklah's offense

---

[2] *See* https://www.gao.gov/blog/2015/04/30/contractors-in-iraq-afghanistan.

was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," and (2) that the government should be estopped from arguing that Mr. Alahmedalabdaloklah's goal was political in nature because it achieved his extradition pursuant to a treaty that prohibits extradition for political offenses.

### A. The record does not establish that Mr. Alahmedalabdaloklah's offense had the required intent.

Application of the terrorism enhancement under U.S.S.G. § 3A1.4 requires that the government prove not merely that the offense of conviction is included on a list of specified felonies at 18 U.S.S.G. § 2332b(g)(5)(B), which Mr. Alahmedalabdaloklah concedes that 18 U.S.C. § 2332a is, but also that it was done with an intent to "affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g). The government must show that Mr. Alahmedalabdaloklah had the required intent, not merely that others involved in the offense may have had it. *United States v. Alhaggagi*, 978 F.3d 693, 699 (9th Cir. 2020); *see United States v. Stewart*, 590 F.3d 93, 139 (2d Cir. 2009); *United States v. Chandia*, 514 F.3d 365, 375 (4th Cir. 2008).

Evidence of Mr. Alahmedalabdaloklah's personal intent is notably lacking. The government scoured years of email communications and went through hundreds, if not thousands, of documents and personal records. It also searched materials Mr. Alahmedalabdaloklah had on his person when he was arrested in Turkey. Among those voluminous materials, it found not one comment that mentioned the United States in a negative light, or suggested any political beliefs of any sort. The record is devoid of evidence that establishes by a preponderance of the evidence that Mr. Alahmedalabdaloklah had the intent necessary for application of the enhancement under U.S.S.G. § 3A1.4.

**B. The government should be estopped from arguing that Mr. Alahmedalabdaloklah committed a political offense**.

The government sought Mr. Alahmedalabdaloklah's extradition from Turkey pursuant to a treaty that does not permit extradition for offenses "of a political character or an offense connected with such an offense." Treaty on Extradition and Mutual Assistance in Criminal Matters Between the United States of America and The Republic of Turkey, Turk.-U.S., Jan. 1, 1981, 32 U.S.T. 3111. The treaty also provides that a "a person who has been extradited in accordance with the present Treaty shall not be prosecuted, punished or detained . . . for any offense . . . other than that for which extradition was granted" except in certain circumstances not applicable here. *Id.*

Having sought extradition pursuant to a treaty that does not permit extradition for political offenses, nor permits alteration of the indictment after extradition is effected, the government should not now be heard to argue that Mr. Alahmedalabdaloklah's offense was political in nature.[3]

**V.    Objection to Failure to Award Minor Role**.

Mr. Alahmedalabdaloklah objects to the PSR's failure to award him a reduction for "minor role." Mr. Alahmedalabdaloklah's alleged involvement in the 1920's Revolutionary Brigades is that he is alleged to have sold them component electronics and given advice on how to use them. There is no evidence in the record suggesting that Mr. Alahmedalabdaloklah had knowledge of the scope and structure of the activity, participated in planning or organizing the activity, exercised decision-making authority, that he participated extensively in the commission of the activity or performed acts over which he had discretion, or that he stood to benefit from the criminal activity. U.S.S.G. § 3B1.2. His role the

---

[3] Mr. Alahmedalabdaloklah hereby gives specific notice that to the extent that the government is seeking an enhancement under U.S.S.G. § 3A1.4, any representations made by any agent of the United States to any party, including other agents of the United States regarding the non-political nature of this offense are subject to mandatory disclosure under *Brady v. Maryland* and progeny.

offense is most like "a defendant who does not have proprietary interest in the criminal activity and who is simply being paid to perform certain tasks," and he therefore "should be considered for" the mitigating role adjustment. *Id.*

Certainly, as compared to the only two other identified co-conspirators—Jamal Al-Dhari, and his cousin, Harith—Mr. Alahmedalabdaloklah played a significantly mitigated role as compared to either Al-Dhari. Discovery provided in this case indicates that both Al-Dharis were military leaders in the 1920's Revolutionary Brigades. Jamal Al-Dhari arranged financing, transportation and support for Brigades' members. Harith Al-Dhari was a military commander for the Brigades.

### VI.     Objection to Offense Conduct

Mr. Alahmedalabdaloklah objects generally to the description of the "Offense Conduct" in PSR ¶¶ 8–19 as repeating uncritically facts put forth by the government in support of a frequently shifting theory of liability and disregards the entirety of the substantial evidence put on by Mr. Alahmedalabdaloklah. Mr. Alahmedalabdaloklah expressly does not stipulate to any version of the facts recited in the PSR and will rely on the entire case record when pursuing his appeal.

In addition to, and without waiving, this general objection, Mr. Alahmedalabdaloklah objects specifically to the following statements in the PSR as unsupported by the record:

- PSR ¶ 8: Mr. Alahmedalabdaloklah objects to the statement that "component parts were intended to be used in IEDs against United States military personnel and property in Iraq." Four days before trial, the government produced a CIPA substitution acknowledging "that the priority of the 1920's Revolution Brigades was fighting *multinational* forces in Iraq." (emphasis added) Mr. Alahmedalabdaloklah further objects that he was acquitted of all conduct that required a finding that he

9

participated in a conspiracy regarding conduct directed at people, rather than at property.

- PSR ¶ 9: Mr. Alahmedalabdaloklah objects again to the inaccurate characterization of the Brigades' focus as targeting American, rather than multinational forces. Mr. Alahmedalabdaloklah also objects to the statements about "press releases," which were not introduced at trial and appear only to exist in the expert report of an expert with questionable qualifications, who the government withdrew reliance on before trial. He further objects that the United States failed to prove at trial that "the Brigades" was a single, unified organization acting with a single purpose such that Mr. Alahmedalabdaloklah could rightfully be considered responsible for or even tied to actions of any and all parts of it. Indeed, the evidence tended to show the opposite—that there were different factions of the Brigades, and Mr. Alahmedalabdaloklah's purported association with Harith and Jamal Al-Dhari does not render relevant "press releases" put out by unknown persons claiming to be affiliated with the Brigades. It was also not further established either before or during trial that these press releases were in fact released by the Brigades. The two sentences referring to "press releases" should be struck from the PSR.

- PSR ¶ 10: Mr. Alahmedalabdaloklah objects to the characterization of the tape containing his fingerprints as "wrapped around a completed IED triggering switch," both because (1) the government expert admitted at trial that the device in question was in fact not a completed IED triggering switch because it would need a matching transmitter to "trigger," *i.e.*, turn on or off, and no matching transmitter was present at the location where the device was found, (2) the government expert admitted it was just a switch that could be used to turn on and off

*anything* and was not IED-specific in its design or application, and (3) the entire box had been disassembled, and the "tape" was not attached to it at any point in the documented chain of custody. In addition, expert reports produced in discovery described the device as a "commercially available" "wireless receiver" powered by two commercially available batteries and noted that it had only observed one other switch of this variety in its review of IED materials gathered in Iraq. Description of the object as a "completed IED switch" is pure editorializing unsupported by any facts or evidence in the record.

- PSR ¶ 15: Mr. Alahmedalabdaloklah objects to the statement that Jamal Al-Dhari "testified that the defendant shared the goals of the Brigades." Mr. Al-Dhari made no such statement. When AUSA Kaster asked Mr. Al-Dhari if "Mukhtar share[d] the overall goals of the 1920 Revolution Brigades," and Al-Dhari answered non-responsively: "Mukhtar believes that what happened to the Iraqis is unfair." AUSA Kaster followed up this non-response with, "How do you know that Mukhtar shared the goal of the 1920 Revolution Brigades?" The answer was "Because he was helping the 1920 Revolution Brigades." In other words, Al-Dhari testified, at best, that "Mukhtar" was helping the Brigades and that Al-Dhari equated this help with support for its goals. This testimony is not reasonably comparable to a statement that Mr. Alahmedalabdaloklah "shared the goals of the Brigades."

- PSR ¶ 16: Mr. Alahmedalabdaloklah objects to the characterization of Mr. Ali Ways's testimony. Ali Ways testified that someone named "Engineer Diya" had a grey box that could be used for explosives, but when shown a picture of Mr. Alahmedalabdaloklah, he could not identify him as "Engineer Diya" and said he thought the picture was of an entirely different person named "Lieutenant Ahmad," Mr. Alahmedalabdaloklah

11

objects to any suggestion that Mr. Ali Ways identified him as the person with the grey box.

Respectfully submitted:                    November 25, 2025.

JON M. SANDS
Federal Public Defender

s/Jon M. Sands
JON M. SANDS
Federal Public Defender
*Attorney for Defendant*

12